UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PAULA A. ATES, individually and on behalf of all those similarly situated,<br><br>        *Plaintiff,*<br><br>vs.<br><br>DELTA AIRLINES, INC.; AMERICAN AIRLINES, INC.; SOUTHWEST AIRLINES, CO.; an UNITED AIRLINES, INC.,<br><br>        *Defendants* | Civil Action No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff, Paula A. Ates, files this civil antitrust action under Section 1 of the Sherman Act, Section 4 and 16 of the Clayton Act, and Rule 23 of the Federal Rules of Civil Procedure, for treble damages, costs of suit, and other relief as may be determined as just and proper, on behalf of herself and those similarly situated against Defendants Delta Airlines, Inc., American Airlines, Inc., Southwest Airlines Co. and United Airlines, Inc. for Defendants' conspiracy to restrict output and thereby to fix, raise, maintain or stabilize prices of passenger airline tickets through a number of means including colluding to limit seat capacity and signaling other airlines on how quickly they would add new flights, routes and extra seats in order to limit the capacity of passenger airline travel in the United States. Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges:

**I. JURISDICTION AND VENUE**

1. Plaintiff's claim for injuries for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, are brought pursuant to Sections 4 and 16 of the Clayton

Act, 15 U.S.C. §15 and 26, to obtain injunctive relief and to recover treble damages and the costs of suit, including reasonable attorneys' fees.

2. This Court has original federal question jurisdiction over the Sherman Act claim pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §15 and 26.

3. Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period one or more Defendants resided in, transacted business in, were found in, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected trade and commerce described below has been carried out in this District.

4. This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business in this District: (b) directly or indirectly sold and delivered passenger airline tickets in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy to limit seat capacity that was direct at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

5. Jurisdiction and venue are further appropriate in this District for the location of Louis Armstrong New Orleans International Airport.

**II. PARTIES**

6. Plaintiff Paula A. Ates ("Plaintiff") is a resident of LaPlace, Louisiana who directly purchased a passenger airline ticket from one of the Defendants at supracompetitive prices and suffered antitrust injury and damages as a result.

7. Defendant Delta Airlines, Inc. ("Delta") is a Delaware corporation with its principal place of business located at Hartsfield Atlanta International Airport, 1030 Delta Boulevard, Atlanta, Georgia 30354-1989.

8. Defendant American Airlines, Inc. ("American") is a Delaware corporation with its principal place of business located at 433 Amon Carter Blvd., Fort Worth, Texas 76155.

9. Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its principal places of business located at Long Island MacArthur Airport, 201 Clark Drive, Ronkonkoma, NY 11779 and 2702 Love Field Drive, Dallas, Texas 75235.

10. Defendant United Airlines, Inc. ("United") is a Delaware corporation with its principal place of business located at 233 South Wacker Drive, Chicago, Illinois 60606.

11. On information and belief, other airlines have participated in the conspiracy to limit seat capacity and conspired with Defendants in the conspiracy alleged herein.

12. The acts alleged herein to have been committed by Defendants were authorized, ordered or performed by Defendants' directors, officers, managers, employees, agents or representatives in the course of their employment and while actively engaged in the management of Defendants' businesses.

**III. INTERSTATE TRADE AND COMMERCE**

13. Throughout the Class Period, there was a continuous and uninterrupted flow of interstate trade and commerce throughout the United States in the provision of passenger airline services and airline ticket sales by Defendants to their customers located in every state and conducted at airports located in every state throughout the United States.

14. Throughout the Class Period, Defendants' conspiracy to limit seat capacity took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce throughout the United States.

## IV. FACTUAL ALLEGATIONS

15. This action alleges collusion among the major passenger airlines to limit routes, information and available seats in order to keep the price of airline tickets for passenger travel on U.S. routes artificially high. Plaintiff alleges that Defendants colluded and agreed to limit seat capacity and illegally signaled to each other how quickly they would add new flights, new routes, and extra seats on existing fights and routes, in order to restrict output and thus keep prices of passenger airline tickets artificially high.

16. On June 30, 2015, the United States Department of Justice ("DOJ") sent civil investigative demand letters to major airlines as part of an investigation into the possible unlawful coordination to limit seat capacity increases, and thereby keep ticket prices high. The DOJ demanded copies of all communications between carriers, their shareholders and investment analysts about their plans for limiting seat capacity.

17. All the ways in which the airlines have coordinated are not immediately clear, but the DOJ investigators are considering at least public comments by airline executives and industry experts. Those public comments are made in meetings that include last month's International Air Transport Association conference and others where the airlines have continuously signaled to each other that it was in their joint interest to keep capacity tight and to keep prices high. At that meeting, the airline executives stressed the importance of "capacity discipline" to cut down on costly, competitive price wars.

18. A United Airlines spokesperson confirmed to news agencies that the airline has received a letter from the DOJ and was complying with their requests. American Airlines also was reported to have received notice from the DOJ and stated it would fully cooperate with the investigation. A spokesperson for Southwest Airlines confirmed receiving the notice from the DOJ and stated it would cooperate fully in the investigation. Representatives from Delta Airlines also confirmed they were among those being investigated and were complying with the DOJ requests.

19. Following a series of airline mergers, American, Delta, Southwest and United now control 80 percent of the U.S. market. During the relevant period, the average domestic airfare rose 13 percent from 2009 to 2014 adjusted for inflation according to data from the Department of Transportation's Bureau of Transportation Statistics:



Available at http://www.rita.dot.gov/bts/airfares/national/chart

20. In the first quarter of this year, American logged $1.2 billion in profit – its most profitable three months ever. The International Air Transport Association projected in June 2015 that the airline industry profits would more than double in 2015 to nearly a record $30 billion.

21. The average domestic flight in 2014 cost $392, the highest annual fare since the Bureau of Transportation began collecting air fare records in 1995 and 2.5 percent higher than the previous high of $382 in 2013.

*See* http://www.rita.dot.gov/bts/press_releases/bts021_15

Adjusted for inflation, fares are at a 12-year high. The statistics include only the price paid at the time of the ticket purchase and do not include other fees paid at the airport or onboard the aircraft.

| Year | 2014 constant dollars* | | | Current dollars | | |
|---|---|---|---|---|---|---|
| | Average Fare ($) | Percent Change | | Average Fare ($) | Percent Change | |
| | | From Previous Year (%) | Cumulative from 1995 (%) | | From Previous Year (%) | Cumulative from 1995 (%) |
| 1995 | 454 | | | 292 | | |
| 1996 | 418 | -7.9 | -7.9 | 277 | -5.3 | -5.3 |
| 1997 | 424 | 1.4 | -6.7 | 287 | 3.8 | -1.7 |
| 1998 | 450 | 6.2 | -0.9 | 309 | 7.6 | 5.8 |
| 1999 | 461 | 2.4 | 1.5 | 324 | 4.7 | 10.8 |
| 2000 | 467 | 1.3 | 2.9 | 339 | 4.7 | 16.0 |
| 2001 | 429 | -8.2 | -5.6 | 321 | -5.4 | 9.7 |
| 2002 | 411 | -4.1 | -9.4 | 312 | -2.6 | 6.9 |
| 2003 | 406 | -1.3 | -10.6 | 315 | 1.0 | 7.9 |
| 2004 | 383 | -5.7 | -15.7 | 305 | -3.2 | 4.5 |
| 2005 | 373 | -2.7 | -17.9 | 307 | 0.6 | 5.2 |
| 2006 | 386 | 3.6 | -15.0 | 329 | 6.9 | 12.4 |
| 2007 | 372 | -3.6 | -18.1 | 325 | -1.0 | 11.3 |
| 2008 | 381 | 2.4 | -16.1 | 346 | 6.5 | 18.5 |
| 2009 | 343 | -10.1 | -24.5 | 310 | -10.4 | 6.2 |
| 2010 | 365 | 6.5 | -19.6 | 336 | 8.3 | 15.0 |
| 2011 | 383 | 4.9 | -15.6 | 364 | 8.3 | 24.5 |
| 2012 | 387 | 0.9 | -14.9 | 375 | 3.0 | 28.3 |
| 2013 | 389 | 0.6 | -14.3 | 382 | 1.9 | 30.7 |
| 2014 | 391 | 0.6 | -13.8 | 392 | 2.5 | 34.1 |

SOURCE: Bureau of Transportation Statistics
* Rate calculated using Bureau of Labor Statistics Consumer Price Index.
Note: Percent change based on unrounded numbers

6

Available at http://www.rita.dot.gov/bts/airfares/programs/economics_and_finance/air_travel_price_index/ht ml/AnnualFares.html

22. While fares have been going up, so too have fees that carriers charge for things such as checked bags and reservation changes. News sources report that the airlines collected $3.6 billion in bag fees and $3 billion in reservation-change fees, and that U.S. airlines earned a combined $19.7 billion in the past two years.

23. Senator Richard Blumenthal, D-Connecticut, recently wrote the DOJ urging the investigation, following the international airline conference in June 2015 in Miami, where several executives of the airlines said they were being careful to limit service increases amid cheap fuel to protect profit margins. The letter urged the DOJ to "investigate this apparent anti-competitive conduct potentially reflecting a misuse of market power, and excessive consolidation in the airline industry."

24. Senator Charles Schumer, D-New York, said in a recent statement that "[i]t's hard to understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed." "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity," said Senator Schumer. "So I'm urging the feds to step in and do a price investigation on behalf of consumers who must buy holiday travel tickets that can break the bank. The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather. That is why I urge the DOJ and DOT to immediately investigate why airline profits are not more efficiently being passed down to consumers."

Available at http://www.schumer.senate.gov/newsroom/press-releases/schumer-as-fuel-costs-plummet-airfares-for-nyers-this-holiday-season-remain-extremely-high_calls-for- federal-investigation-into-why-dramatically-lower-fuel-costs-and-record-airline-profits-are-not- being-passed-on-to-consumers-through-lower-fares.

25. Recent reports have indicated that airlines are now making record profits. According to the International Air Transport Association, airlines' collective global net profit in 2014 was expected to be $19.9 billion and in 2015 was expected to be $25 billion. In 2013, airline profits were approximately $11 billion. In addition to record profits, fuel prices were dramatically falling and were expected to continue to drop. Fuel prices were about $60/barrel in December 2014 and according to the International Air Transport Association, the average oil price in 2015 was expected to be $85/barrel, whereas in years past, the average oil price has been above $100/barrel.

26. Financial filings show that historically low prices for jet fuel have helped the carriers save billions of dollars on their biggest expense, with the four major airlines saving about $3.3 billion on fuel in the first quarter of 2015.

27. The DOJ investigation also followed reports by the NEW YORK TIMES on June 11, 2015 entitled "Discipline for Airlines, Pain for Fliers." "Discipline" was the buzzword at the International Air Transport Association Annual General Meeting in Miami held June 7-9, 2015.

28. Delta Air Lines' President Ed Bastian stated that Delta was "continuing with the discipline that the marketplace is expecting."

29. Air Canada's CEO Calin Rovinescu stated that "[p]eople were undisciplined in the past, but they will be more disciplined in time."

30. American Airlines CEO Doug Parker said the airlines had learned their lessons from past price wars and told Reuters "I think everybody in the industry understands that."

31. Jeff Sismek, the CEO of United, was quoted in January 2015 while announcing a $2 billion profit for United in 2014 that "[w]e will absolutely not lose our capacity discipline. . . . It's very health for us and very healthy for the industry."

32. "Discipline" has been reported to be the "classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins" and "industry jargon for limiting flights." "When airline industry leaders say they're going to be disciplined, they mean they don't want anyone to expand capacity," said Fiona Scott Morton, professor of economics at Yale and former deputy attorney general in the antitrust division of the Justice Department. "And when there aren't enough seats, airlines raise prices. That's what we've been seeing."

33. Business Travelers Coalition chairman Kevin Mitchell confirmed on July 2, 2015 that "[s]ince recent U.S. airline mega-mergers, *we have witnessed near constant airline CEO calls for 'capacity discipline' during industry gatherings and analyst earnings calls* only to be echoed by analysts in follow-on earnings calls with other airlines. This represents perhaps the darkest hours of airline coordination as well as a too-cozy harmonization between the airlines and Wall Street."

34. The NEW YORK TIMES article reported that "after coming under fire" at the International Air Transport Association Annual General Meeting in Miami held June 7-9, 2015, Southwest, which had previously announced it planned to increase its capacity by 8 percent at its hub at Love Field in Dallas, "moved to reassure investors it isn't going

rogue." Gary C. Kelly, the CEO of Southwest, stated "[w]e have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth."

35. Senator Richard Blumenthal wrote to U.S. Assistant Attorney General William Baer on the withdrawal by Southwest of its plans to increase capacity: "[t]he conclusion seems inescapable that the remarks made at IATA were targeted at Southwest and that its capitulation was the result of the 'fire' aimed at the company."

36. Senator Blumenthal further noted in his letter to Assistant Attorney General Baer that the DOJ's investigation into the US Airways merger with American Airlines in 2013 that "most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins." Senator Blumenthal wrote:

> DOJ's original complaint painted a stark picture of an extremely consolidated market, in which a few firms wield enormous market power to the detriment of consumers and competition – and in which high-level executives believe there is an unmistakable link between fluctuations in capacity and fare hikes. During the court of the Antitrust Division's review of the American Airlines / US Airways merger, your staff studied the internal analyses and the planning documents put together by both companies in considering the likely effects of the merger. During DOJ's original announcement rejecting the merger you stated, "High level executives at US Airways have talked about how consolidation allows for capacity reductions that "enable" fare increases."

## V. CLASS ACTION ALLEGATIONS

37. Plaintiff brings this action on behalf of herself and, under Rules 23(a) and (b) of the Federal Rules of Procedure, on behalf of a class (the "Class") defined as follows:

> All persons and entities who purchased an airline passenger ticket directly from any of the Defendants from January 1, 2010 to present (the "Class Period").

38. Excluded from the Class are Defendants and their employees, subsidiaries, affiliates, parents, partners and agents, whether or not named in this Complaint.

39. Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, the Class is readily identifiable from information and records in the possession of Defendants.

40. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

41. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

42. Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation.

43. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate. Questions of law and fact common to the Class include, but are not limited to:

    a. Whether the Defendants and their co-conspirators colluded to fix, raise, stabilize or maintain the prices of, or to restrict output for, passenger airline tickets in the United States;

    b. Whether Defendants' conduct violated Section 1 of the Sherman Antitrust Act;

    c. Whether Defendants' conduct cause injury and damage to Plaintiff and the members of the Class;

      d. The appropriate measure of damages resulting from the violation of Section 1 of the Sherman Antitrust Act;

      e. The operative time period of Defendants' violations of Section 1 of the Sherman Antitrust Act; and

      f. Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

44. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

45. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI. COUNT ONE: PRICE FIXING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

46. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

47. The combination and conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Antitrust Act.

48. Alternatively, the combination and conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Antitrust Act.

49. Defendants intended to and actually did restrain trade. They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of restricting output and artificially fixing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of airline passenger tickets.

50. The conspiracy unreasonably restrained trade. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

51. Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

52. Plaintiff and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**VII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays that the Court:

A. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare Plaintiff Paula A. Ates as a named representative of the class;

B. Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

C. Enter joint and several judgments against the Defendants and in favor of Plaintiff and the Class;

D. Award the Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

E. Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

F. Award such further and additional relief as is necessary to correct for the anticompetitive market effects caused by the Defendants' unlawful conduct, as the Court may deem just and proper under the circumstances.

## VIII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and the proposed class, demands a trial by jury on all issues so triable.

August 4, 2015

      /s/ Matthew M. Moreland
BECNEL LAW FIRM, LLC
Daniel E. Becnel, Jr. (La Bar #2926)
Matthew B. Moreland (La. Bar #24567)
Jennifer L. Crose (La. Bar #32116)
P.O. Drawer H
106 West 7th Street
Reserve, LA 70084
*Counsel for Plaintiff Paula A. Ates and the Proposed Class*